# STATE OF MICHIGAN

# COURT OF APPEALS

---

ILENE TINMAN and MICHAEL TINMAN, as
next friends of TZVIH TINMAN,

        Plaintiffs-Appellees/Cross
        Appellants,

v

BLUE CROSS AND BLUE SHIELD OF
MICHIGAN,

        Defendant-Appellant/Cross
        Appellee.

UNPUBLISHED
September 24, 2015

No.   322601
Wayne Circuit Court
LC No.   99-932051-CK

---

Before:  K. F. KELLY, P.J., and CAVANAGH and SAAD, JJ.

PER CURIAM.

Defendant-appellant/cross appellee, Blue Cross and Blue Shield of Michigan (Blue Cross or BCBSM), appeals as of right an opinion and order awarding $876,885 in attorney fees to plaintiffs-appellees/cross appellants, Ilene Tinman and Michael Tinman, as next friends of Tzvih Tinman (plaintiff).  We affirm in part, reverse in part, and remand for further proceedings.

## I.  BASIC FACTS AND PROCEDURAL HISTORY

This attorney fee dispute arises from litigation in which plaintiff claimed that Blue Cross improperly failed to pay hospital emergency bills that incurred for Tzvih's medical care.  Though the issues that confront us on appeal are rather straight forward, the long history of this case is not.  In fact, this is the fourth time this case has been before this Court.  See *Tinman v Blue Cross & Blue Shield of Mich*, 264 Mich App 54; 692 NW2d 58 (2004) (*Tinman I*); *Tinman v Blue Cross & Blue Shield of Mich*, unpublished opinion per curiam of the Court of Appeals, issued February 14, 2008 (Docket No. 268448) (*Tinman II*); and *Tinman v Blue Cross & Blue Shield of Mich*, unpublished opinion per curiam of the Court of Appeals, issued September 6, 2012 (Docket No. 298036) (*Tinman III*).  Because the parties are familiar with the extensive history of this case, we need not provide a detailed recitation of facts.

Plaintiff sued Blue Cross after Blue Cross refused to pay for Tzvih's emergency room visit, claiming that Blue Cross violated MCL 550.1418 by denying coverage based on Tzvih's "final diagnosis" as opposed to his presenting symptoms.  Because plaintiff believed that Blue Cross systematically denied coverage for emergency services on the basis of an insured's final

-1-

diagnosis, plaintiff brought suit on his behalf as well as other Blue Cross insureds. Blue Cross then removed the case to federal court, where the federal court dismissed some of the ERISA claims. The federal court declined to address the issue of whether plaintiff's action was properly brought as a class action. *Tinman v Blue Cross & Blue Shield of Michigan,* unpublished memorandum opinion and order of the United States District Court, Eastern District of Michigan, issued January 31, 2002 (Docket No. 00-CV-72327-DT). On remand to the Wayne Circuit Court from the federal district court, former Judge Warfield Moore certified the class. However, this Court reversed that order, finding that the individual questions of each plaintiff predominated over the common questions presented. *Tinman I*, 264 Mich App at 564-656. On remand from this Court to the Wayne Circuit Court, Judge Moore denied plaintiff's attempt to certify a class for declaratory and equitable relief, which this Court affirmed in *Tinman II*. In the meantime, Judge Moore had granted plaintiff summary disposition. Plaintiff then sought attorney fees of over $900,000. An incomplete evidentiary hearing was held and Judge Stempien awarded plaintiff $655,000 in attorney fees and $2,440 in costs.

The matter then came to this Court for a third time in *Tinman III*. We found that the trial court abused its discretion in refusing to complete the evidentiary hearing regarding attorney fees. *Tinman III*, slip op, pp 4-7. We also concluded that the trial court's analysis was insufficient to justify the award or enable meaningful appellate review, pointing to the trial court's failure to make adequate findings regarding "the customary fee in the locality for each attorney, the number of hours reasonably expended by each attorney on plaintiff's individual claim as opposed to their unsuccessful class-action claim, and the use of more than one attorney on the same general tasks." *Id.* at 7. The *Tinman III* Court ordered the trial court to, on remand, "make more specific findings, consistent with *Smith* [*v Khouri*, 481 Mich 519, 530-533; 751 NW2d 472 (2008)] and *Augustine* [*v Allstate Ins Co*, 292 Mich App 408; 807 NW2d 77 (2011)], regarding [1] the customary fee in the locality for each attorney whose fees plaintiffs seek to recover, [2] the reasonable number of hours expended by each attorney, and [3] the reasonableness of having multiple attorneys working on the same general task." *Id.* at 11.

Finally, the *Tinman III* Court addressed defendant's claim that the trial court improperly applied the "catalyst theory" to its fee award: "In assessing whether plaintiffs' baseline attorney fees were excessive in light of the size of the monetary judgment, the trial court abused its discretion in considering defendant's voluntary changes to its emergency-claims procedures." *Id.* at 11. Citing *Buckhannon Bd and Care Home, Inc v West Virginia Dep't of Health and Human Resources*, 532 US 598; 121 S Ct 1835; 149 L Ed 2d 855 (2001), the *Tinman III* Court concluded that "the results achieved should be considered in the context of the claim presented, i.e., the substantive merits of the case, rather than a change in the defendant's conduct that the trial court did not order." *Id.*

The case then returned to the trial court and Judge Stempien, where the court conducted an exhaustive evidentiary hearing.

John Zuccarini of the Simon firm testified that he was primarily responsible for keeping track of the hours spent on the Tinman case and class action.[1]  Zuccarini had been practicing law since 1988 and was an editor for the Wayne Law Review.  Zuccarini explained that Simon was the firm's owner and decided which cases to take.  Wassman and Young were the principal attorneys who had primary responsibility for the Tinman case.  The case was a collaborative effort, meaning that the attorneys met and talked about trial strategy.  As a general rule, they would circulate complaints and briefs for review by other attorneys.  Simon made it clear that all attorneys should enter their time contemporaneously with the work performed.  Zuccarini would write his time on a piece of paper and have his secretary type it.  For the Tinman case, there was no monthly summary, but the case was reviewed on a quarterly basis.  Zuccarini denied that there was pressure to inflate the hours worked on the case.

Zuccarini testified to the extensive case history.  There were 141 docket entries while the case was in federal court.  In state circuit court, the entries through July 2008 alone numbered 259.  He believed that the over 400 docket entries "jived" with the complexity of the case, whose file comprised several file cabinet drawers and 30 or more boxes.  At least six different judges participated in some way with the case.  Contrary to defense counsel's statement, Zuccarini testified that a principle allegation in the Tinman case was that defendant had violated MCL 550.1418(1) by denying payment based on final diagnosis.

Zuccarini testified that, in drafting the complaint, a significant amount of time was spent anticipating and preparing for possible defenses.  In its answer, defendant denied withholding benefits based on illegal criteria.  Defendant did not admit that they based the denial on a final diagnosis, specifically stating that "Blue Cross did not deny Plaintiff's claim or any alleged class claims on the basis of final diagnosis."  Even after the class was decertified, defendant never admitted to wrongdoing.  In light of these denials, Zuccarini believed that he had to show that the allegations in the complaint were true – that defendant was "in fact systematically denying claims on the basis of final diagnosis."

Zuccarini testified to certain "smoking gun" documents that were discovered while the case was in federal court.  Defense counsel objected, arguing that "none of these documents are relevant under the Court of Appeals opinion that decertified the class in 2004."  The trial court noted:  "Well I'm overruling it because it go[es] to the amount of work that may go, I don't know, I have to look at it, but that may go to the amount of work that was put into the case whether it affects Tinman individually or not, I don't know."

Zuccarini testified that defendant's internal documents indicated that while payment for emergency care must be based on how a patient must be assessed at the time of treatment and not based on final diagnosis, payouts were administered and based on an outdated and inadequate benefit criteria in the Medical Emergency Diagnostic List (MEDL), which had the effect of basing reimbursement on the final diagnosis, rather than signs and symptoms.  If the diagnosis on a claim was not on the MEDL, then the claim was rejected as a nonemergency.  The documents revealed that, when resubmitted, previously rejected claims were paid 88 percent of

---

[1] Zuccarini stopped working at the Simon firm in 2012.

the time.  When manually reviewed, those claims were paid 99.6 percent of the time.  This resulted in a $22 million increase in payout to defendant's customers.  Zuccarini noted that, although these documents were prepared before plaintiff's claim was even rejected, defendant continued to deny wrongdoing in plaintiff's case.  Zuccarini testified that defendant's repeated denials created additional work because the responses were inconsistent with defendant's own internal memos.  And, while one memo indicated that coverage was triggered based on presenting symptoms, the professional claims form did not include a field for presenting symptoms.

Zuccarini did not believe the merits of the issue of liability were different for plaintiff than the other class members and the firm was not seeking fees for time dedicated to the class action.  Only the Tinmans were interviewed; no other class plaintiffs were contacted.  Zuccarini was also seeking fees for time spent researching and preparing the original motion for attorney fees.

Zuccarini testified to the contents of his February 6, 2008 Declaration, which set forth the specific time spent on the case.  The fee application was for 2,257.5 hours, which reflected 1,896.5 hours spent by the Simon firm and 361 spent by Lebenbom.  With hourly fees ranging from $250 to $495, the total request (without regard to hours spent seeking fees) was $937,462.50.  The Simon firm also sought $241,843.75 for 562 hours spent in connection with the fee application.

Zuccarini spent considerable time at the evidentiary hearing defending the time spent, which included:  extensive pre-filing investigation, including researching potential preemption defenses and ERISA; preparing interrogatories; general discovery, planning, and management; numerous motions to compel; responding to defendant's motions for protective order; responding to discovery requests; reviewing, indexing, and analyzing over 50,000 pages of documents; responding to privilege claims; responding to defendant's attempts to keep the records presented in the federal court under seal; preparing for and attending status conferences; reacquainting themselves after matters were adjourned; drafting and responding to motions for summary disposition; preparing motions for reconsideration; preparing a trial binder; and, time spent in settlement negotiations.

Zuccarini acknowledged that there were times when multiple attorneys did the same work.  The firms had four attorneys and an associate, "so everybody pretty much knew what everybody else was doing."  Plaintiff's attorneys "were faced with basically a scorched-earth defense in our view.  It seemed that Blue Cross was throwing everything against the wall to see what would stick and in order to do our job appropriately we had to respond to whatever it is that they threw at us."

Zuccarini testified that, in all, the firm put in 1,953.50 hours on the case from 1999 to 2005.  "Individual time for the first couple of months of the case" totaled 170.25.  There was a computer change and then a "continuation of the non-discovery time attributed to litigation other than the class from the time of the computer change until the end of 2005" totaled 812.5 hours.  Non-class discovery totaled 970.75. Zuccarini agreed that 57 hours should be excluded, bringing the total to 1,896.50.  He added:

I would make the proviso that this was an inexact science, we were asked to after-the-fact divide our time up between class and nonclass matters.

We certainly didn't bill our time . . .from 1999 to 2005 thinking that that was something we would have to do. So when we made the effort to divide our time we did the best we could and we tried to be as conservative as possible.

So subject to that I think this is an accurate reflection of the time devoted by Plaintiff's counsel, counsel to the prosecution of Tinman's individual claim.

Zuccarini testified that any fees incurred after 2005 were for the recovery of statutory attorney fees. Through 2008, the Simon Firm had worked 641.25 hours for attorney fees and expenses. A total of 1,012.75 hours were spent over eight years of fee litigation. He testified that, if anything, the time was underestimated.

Zuccarini identified a 2006 survey of the top 250 firms reflected an average hourly rate of $348 per hour. He also considered what the Simon firm charged its hourly clients from 1999-2005. Simon billed $415 to $465 an hour; Zuccarini billed $395 to $440 an hour; Wassman and Young each billed $395 an hour. Importantly, he also pointed to defendant's billing records. The Bodman firm, which represented defendant, had 32 attorneys work on the case for various tasks. They billed 2,533.9 hours and the total amount was $493,720.05. There was also defendant's in-house counsel, who billed 1,250 hours. James Walsh, defendant's lead counsel, billed $410 an hour at the time. Zuccarini noted that his son was four when the litigation started and had just graduated high school and "we still haven't been paid a penny," while defense counsel was paid as fees were incurred. Plaintiff's counsel also presented surveys from the State Bar of Michigan Economics of Law Practice. The trial court considered the National Law Journal because attorneys had done work nationally.

During cross-examination, Zuccarini acknowledged that the Simon firm often acted as local co-counsel and that very few of their cases were ever tried. Defense counsel tried to hammer home the fact that the Simon firm was a class action law firm with very few, if any, non-contingency or fee-shifting clients. Zuccarini denied that the firm "padded" its time because it knew it was going to be paid by the opponent. The firm was seeking fees for time spent before Mrs. Tinman received the EOB as well as for investigating antitrust issues and ERISA preemption even though those issues did not apply to Tinman. Zuccarini defended spending 140.25 hours to research and draft the complaint. He acknowledged some differences between Wassman's time and other attorneys, but suggested that the attorneys simply did not claim the time or considered the time to be in pursuit of the class action. As defense counsel attacked the billings line by line, the trial court noted that defendant did not provide a breakdown of each task performed; it only supplied the total number of hours and the total amount billed.

The trial court questioned Zuccarini about the fact that defendant had changed the manner in which it administered emergency benefit claims in an effort to comply with the law and avoid further litigation.

Mark Bendure testified that he had been an attorney for 40 years and concentrated on appellate work. He was a member of numerous state and federal bars. He has been recognized

-5-

by Super Lawyers every year since 2007, was honored by Michigan Lawyers Weekly, and Crain's Detroit. Bendure had entered into a "blended hourly/contingent fee" with plaintiff for his appellate work. It was originally a fixed amount of $8,000-$10,000 plus a percentage of any recovery. The $350 an hour that Bendure used, therefore, did not reflect the actual agreement; it was a reflection of what he believed to be a reasonable hourly rate. His hourly rate to other clients was $300-$350 and he compared his rates to Walsh. He also consulted the Appellate Practice Section Survey, which had an average rate of $250, as well as State Economics Survey.

Elwood Simon testified during earlier proceedings and the parties stipulated to admitting his prior testimony. Simon nevertheless testified at the hearing.[2] His area of expertise was class action litigation on complex matters. He defended the time spent investigating the case before filing the complaint as an attempt to comply with the court rules that require an adequate investigation in law and facts. Simon was "comfortable" to learn that there was a fee-shifting provision in the statute that would allow him to collect attorney fees, even if a class action failed. The Simon firm incurred substantial costs of over $60,000 but had been awarded a small percentage – just over $4,000. Plaintiff's counsel assured the trial court that he was not seeking additional costs, but was simply trying to dispel defense counsel's claim that there was a windfall.[3] Simon guessed that he had "written off" nearly 1,000 hours for class work.

Defense counsel objected when Simon testified that the firm learned about defendant's systemic claim denial by defendant after reviewing 50,000 pages of documents. The following exchange took place:

> MR. WALSH: Objection, your Honor, that's completely irrelevant. The Court of Appeals has ruled that this case is about Mr. Tinman's claim and nothing else.

> THE COURT: Overruled, for the reason that he's explaining what work he had to do for Mr. Tinman. He['s] explaining work he had to do for Mr. Tinman, also that he was doing for a class, that's what I'm getting.

---

[2] Defense counsel acknowledged that Simon kept meticulous time records and, therefore, defense counsel did not doubt that Simon spent his time as accounted. However, defense counsel challenged whether the hours claimed by the other attorneys (especially Wassman) were actually spent doing what they did: "I'm challenging Wassman's time." "I don't know about Mr. Young, I want to see what he says." In short, defense counsel made it clear that, aside from Simon, he would be challenging whether the hours claimed were actually worked. The focus was not necessarily on whether the amount of time claimed was reasonable but whether the time records were accurate.

[3] Plaintiff's counsel appeared to change his position at a later hearing, arguing that the trial court could revisit the matter of costs without contradicting *Tinman III*. But then during final arguments he added: "They are out $55,000 in costs, as well as the costs of our firm. And we're not seeking recovery of that."

MR. BENDURE: That's exactly where we're going, your Honor.

THE COURT: That's what I'm getting out of it.

MR. WALSH: For the record, your Honor, I'd like to state that the initial Court of Appeal['.]s opinion decertifying the class ruled that it was Mr. Tinman's signs and symptoms that were determinative of his recovery and nothing else. Thank you.

Simon testified that the discovery process confirmed the existence of defendant's declining coverage on the basis of final diagnosis. It "allowed us to prevail in the Tinman case both in terms of disproving the defenses that had been asserted by counsel and by establishing a very, very extensive record to confirm that Blue Cross itself admitted and confirmed they were violating the statute, and had violated the statute by their practice."

Over objection, Simon testified that defendant had changed its policy as a result of the litigation. "[I]t has always been our belief that the reason they made this change was because they got caught, not because they voluntarily did it, although that may be true, they may have voluntarily did it but nothing that we found in our examination of the documentation which was referenced here indicates that it was anything other than a reaction to, among other things, this litigation." Simon testified that defendant had been saving $500,000 a month by rejecting emergency visit claims. The documents revealed that changes were necessary "'to avoid challenges such as the one in the pending case.'" The documents specifically point to the class action lawsuit based on diagnosis-related rejections.

Simon testified that they took a collaborative approach at the firm and, therefore, some activities were conducted by more than one attorney at the office. Each attorney played a role. Wassman was the lead attorney, Zuccarini's strength was his writing, and Young's strength was his command of economics. Simon believed the case was particularly difficult because it was a matter of first impression and "defendant was very staunch in its defense." Work on the Tinman case precluded the firm from taking other clients. Simon concluded: "Whatever the Court awards in terms of reasonable fee, it will never be a windfall to us, number one, and all it will do is to reduce the windfall that Blue Cross has benefited from not having to pay out the benefits and retaining those benefits that were due under the law that they didn't pay." When defense counsel tendered the $800 check in April 2005, there was no offer to satisfy the obligation to pay attorney fees.

Lance Young testified that he worked for a steel company for two years after law school before joining the Simon firm, where he worked for ten years before spending five years in private practice and ultimately joining the Sommers Schwartz firm. Young testified that he no longer had an economic interest in the outcome of the litigation.

Young testified that the Simon law firm kept accurate records, which were required by the courts and co-counsel. He testified that he accurately reported the time spent on the Tinman case. He denied being under any pressure to inflate his time. Zuccarini's declaration accurately reflected the time spent on the Tinman case and "if anything the numbers here are fairly light." Young remembered "30, 40, 50 boxes of physical documents in the hallway" containing 50,000

pages of documents that the attorneys had to review. It was among those documents that they unearthed evidence that defendant based its payment decision on final diagnosis instead of signs and symptoms. In Young's opinion, "Tzvih's case was to prove that Blue Cross denied his claim on the basis of final diagnosis." "What we were going to prove for Tzvih Tinman as the name class rep, had the case continued to be certified, would have proven the case for everybody else. The fact that it was decertified is no detraction from the fact we still had to prove these basic elements for Tzvih Tinman's case."

Young defended time claimed for general strategy, reviewing, indexing, and analyzing documents, as well as working on privilege logs, motions, and brief writing. Contrary to his colleagues, Young denied doing much pre-filing work on ERISA and was "surprised" when the case was removed to federal court. But he also did quite a bit of researching into the meaning of the term "final diagnosis." Young's hourly rate in 1995 was $250 to $300 an hour.

Attorney Michael Wassman lived in Pennsylvania and testified under subpoena. He was a graduate of Hillsdale College and George Mason Law School. He specialized in corporate and securities law and his first job was with the Simon firm in 1992.[4] He described the Simon firm as a "boutique specialty firm that focuses on commercial class action litigation," securities litigation, ERISA, and consumer protection. Nearly every case was a class action case. Most of the time the cases were assigned to one or two attorneys. However, strategy was one area where the firm did a lot of collaboration because invariably, the opposing side would have a team of attorneys. Wassman was primarily responsible for litigating the Tinman case. The Tinman's family attorney, Stuart Lebenbom, approached the Simon firm with what Lebenbom thought was a unique case – potentially the first case to apply the statute that prohibited denying coverage on the basis of final diagnosis. The case involved researching the statute for precedent and also determining whether this was a common practice. Wassman testified that not "skimping" on the complaint was critical. He defended the time put into the pre-filing as well as time spent drafting the complaint, noting that the complaint survived six years of litigation. He also defended the amount of time spent on responding to motions, including defendant's motions regarding sealing records. Time was also spent on deciding whether to accept defendant's settlement check and whether to settle. Wassman admitted that a concern in accepting the check was the potential waiver of fees.

Wassman believed that defendant systematically refused payment to its insureds. He noted that defendant never admitted to refusing to pay emergency room claims on the basis of final diagnosis "and from what I'm hearing today they still deny it." Wassman explained that the merits of Tinman's individual claim jived with the class action and in order to prove Tinman's claim, they had to "prove what was happening behind the curtain." Wassman believed efforts taken on behalf of the class were compensable as a result of the common benefit it created for all of defendant's customers, regardless of whether the class was decertified.

Wassman felt ethically obligated to represent Tinman even if there was no class certification. The decertification did not change the nature of the liability issue – "We still had to

---

[4] He left the firm in 2005. He never had an equity interest in the firm.

prove that his individual claim was denied based on final diagnosis." Wassman did not consider the fact that this was simply an $800 case – "I don't leave my client out to dry because their claim isn't big enough. Wassman believed defendant attempted to confuse the issue by using language such as preliminary diagnosis.

Wassman testified that he would often enter his time at the end of each day, but when he was busy he would keep a note pad next to his computer and enter his time that way, allowing a few days to go by. Wassman testified that his time was accurate and denied being encouraged to inflate his time. He made sure that the time spent on the individual claim was separated from the time spent on the class action. Wassman spent approximately 1,600 hours in class work and 1,223.75 hours for Tinman's individual claim. He underestimated the individual claim and overestimated the class work. Wassman also spent 213.5 hours on the fee application. He admitted that Tinman's claim did not involve ERISA. He also admitted to spending time seeking to unseal records because "sealing the record is a way for defendant who did bad things to hide from the public what they are doing" and "sunlight will make a defendant more willing to do right. And that helps the plaintiff."

When there were adjournments, it required preparing at least two times, which added to the time. Discovery was also difficult because, in Wassman's opinion, defendant wrongfully withheld documents, necessitating various motions to compel and "hoops we were forced to jump through." Once the documents were presented, the attorneys confirmed defendant's internal analysis and concluded that it was violating the law. Wassman categorized defendant's position as "scorched earth," meaning that nothing was produced unless a judge ordered it. Once produced, there were over 50,000 documents. There was no attempt to organize the documents and one key memo was shoved among 2, 000 other exhibits; had the attorneys at Simon not gone through each page, the memo would not have been discovered. One document indicated that payment was based on the outdated MEDL, which confirmed plaintiff's suspicions that defendant looked to the final diagnosis instead of the signs and symptoms. Even in the face of these documents, defendant did not admit liability.

Wassman testified that it was not unheard of for him to work over 16 hours a day. If there were discrepancies in time claimed for conferences, it was likely because Wassman was the lead attorney and had discussion topics to prepare.

The court issued a written opinion on June 19, 2014. The trial court initially noted that defendant "never presented any witnesses to rebut or otherwise dispute the testimony of Plaintiff's lawyers" and "never presented any witnesses, whatsoever, relying solely on cross examination of the lawyers from Plaintiff's firm, present and past." The court also noted that defendant "stipulated at the remand hearing that it was not challenging any fees or hours submitted by Mr. Elwood Simon."

The court took issue with this Court's conclusion in *Tinman III* that defendant voluntarily changed its emergency claims procedures: "Unrebutted and reliable evidence was presented at the remand hearing which established that the description 'voluntary' is an incorrect conclusion and the computer change, though not explicitly directed by a trial court order, was made by BC/BS as a natural and direct result of the Tinman lawsuit." The trial court concluded, therefore, that "[t]he matter of a computer change was not, by any stretch of the imagination, a

voluntary change. This Court finds as a matter of fact based on pleadings, the testimony of witnesses, testifying that without this legal challenge, [defendant] would not have changed it's [sic] computer. *The computer change was not voluntary*, but a direct result of this lawsuit."

Specifically, the trial court referred to defendant's steadfast denials throughout the litigation that plaintiff's claims were rejected on the basis of a final diagnosis without consideration of the presenting signs and symptoms. The court noted that defendant's "form for emergency services does not even have a field 'presenting symptoms' that a health provider could utilize." It was only after the second denial for certification that defendant tendered a check and "even after [defendant] was confronted with its own internal documents evidencing that payment was based on final diagnosis in violation of the law, [defendant's] attorneys continued to deny the fact in open court."

The trial court then went on to address the manner in which to establish a reasonable attorney fee. The court noted that *Smith* and its reference to the customary charges in the locality for similar legal services was a plurality opinion and that it would focus primarily on the factors set forth in *Wood v DAIIE,* 413 Mich 573, 588; 321 NW2d 653 (1982). It noted the extensive file, number of attorneys on both sides, and number of judges who worked on the case. Extensive discovery was necessary because defendant consistently denied wrongdoing. As such, "Tinman, individually, had to prove that [defendant's answer to the complaint] was false before he could recover any amount from [defendant]. It was only through the discovery process that Tinman could ever obtain a summary disposition in his favor." The court found credible Wassman's testimony that the Simon firm remained obligated to Tinman even after class decertification and concluded that, as a matter of fact, "the discovery process was necessary to prove Tinman's individual claim," which included 50,000 unsorted and unlabeled documents. The court noted that "the key to the individual Tinman case was the discovery of the undisclosed computer program. Absent that proof, Plaintiff Tinman could never have prevailed on the summary disposition on the merits."

The trial court separated Simon's fees as "uncontested" in light of defense counsel's failure to challenge the hourly rate.

Addressing the *Wood* factors, the trial court found:

Wood Factor #1 – The professional standing and experience of the attorney are highly experienced and respected.

Many of their clients whom are not contingent fee based, paid Mr. Simon $480.00 per hour, Mr. Zuccarini $440.00 per hour, Mr. Wassman $395.00 per hour, Mr. Maloche $210.00 per hour, Mr. Young $420.00 per hour as of 2005. This Court's Opinion of 2010 awarded less per hour than the firm billed six (6) years prior to it's [sic] opinion.

Wood Factor #2 – the skill, time and labor involved.

Each witness has testified regarding the intense labor required to unearth the [defendant's] Answer to the Complaint. As noted, the 50,000 documents

reviewed were necessary to disern [sic] that the computer system automatically violated Michigan law.

Wood Factor #3 - the amount in question and the results achieved.

This Court recognizes that the end result was a mere Eight Hundred Eleven and 00/100 ($811.00) Dollars recovery for Tinman. Yet Tinman and his lawyers were successfully granted summary judgment. The Appellate Court must keep in mind that by BC/BS attorney's own admission, BC/BS only paid Tinman after it heard it would not have to pay any other wrongfully rejected emergency room bills.

Wood Factor #4 - the difficulty of the case.

It is unquestionable to this trial Court that the Tinman case was very difficult to prove.

Wood Factor #5 - the expenses incurred.

There were over Fifty Thousand and 00/100 ($50,000.00) Dollars in costs and were absorbed by the Simon firm. The costs were necessary to prove Tinman's claim, let alone a class action. This was due to the intractable position of [defendant] to the very end of the remand evidentiary hearing.

Wood Factor #6 - the nature and length of the professional relationship with the client.

This factor is not particularly relevant in plaintiff cases. Most Plaintiffs are only clients for a specific case. Rarely is a[n] individual repeatedly injured by someone's wrongful conduct. A client such as [defendant] would be a repeat client because it is a very large entity whose need for an attorney would range from claims by its many employees, construction claims, contract claims and personal injury claims, to name a few.

The court then reviewed the factors of MRPC 1.5a:

1. The time and labor involved and the novelty of the question and skill required to perform the legal services.

This case is and remains unique. An analysis of a disputed computer program requires lawyering of the most sophisticated experience.

2. Likelihood that acceptance of the work would preclude other employment.

Mr. Wassman and Mr. Zuccarini testified that their firm generally accepted only 10-12 new cases at any given time. They also testified that once the firm was

retained it continued its representation of the individual to its conclusion. Tinman was never abandoned in his pursuit of success on the merits.

Factors 3, 4, 5, 6 & 7 are duplicative of the Wood Factors, though expressed with different terminology.

Factor 8 - whether fee is fixed or contingent.

This was a contingent fee. However, the statute required attorney fees for a wrongful denial of an emergency room visit. It is obvious from all case law from *Wood* to its progeny and the Rules of Professional Conduct, that at some point an analysis of an attorney fee request can only be made by considering an hourly fee.

The trial court also pointed out the massive number of hours billed by defense counsel. It referenced the State Bar Study on the Economics of the Law, which showed that the Simon firm was at the top 5 percent for its hourly rate. And that in 2007 the ABA Journal noted that the largest law firms averaged $348 an hour. The court also considered that the Simon firm had not been paid for nine years. The trial court set an award of $400 per hour. It pointed to the fact that it had already eliminated duplicative tasks in its earlier opinion. It awarded a total of $655,000 in original attorney fees.

The court then addressed plaintiff's "fees for fees" request. It found plaintiff's position persuasive and believed that it would be illogical to allow defense counsel to be paid for defending a fee challenge and not allow plaintiff to do so as well. It awarded Simon and Zuccarini $400 an hour at 466 hours for a total of $186,300. It further concluded that Bendure was entitled to $350 an hour for his 94.7 hours spent for a total of $33,145. Thus the total fee recovery was $219,445.

The trial court declined to award plaintiff's request for fees or costs on appeal because when the Court of Appeals remanded the case, it did not specifically assess costs or attorney fees to either side.

Blue Cross now appeals as of right, arguing that the trial court failed to follow this Court's directives in *Tinman III*. Plaintiff cross appeals, arguing that it should have been permitted to recover attorney fees for services rendered in response to Blue Cross's prior appeal. Therefore, the issues on appeal are straight forward – whether the trial court properly followed this Court's remand directive in ordering attorney fees, whether plaintiff is entitled to "fees for fees" in pursuit of those fees, and whether plaintiff is entitled to attorney fees from a previous appeal.

## II. STANDARD OF REVIEW

An appellate court reviews for an abuse of discretion a trial court's award of attorney fees and costs. *Smith,* 481 Mich at 519. "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id.*

-12-

Whether the law of the case applies is a question of law subject to de novo review. *KBD & Assoc, Inc v Great Lakes Foam Tech, Inc*, 295 Mich App 666, 679; 816 NW2d 464 (2012). Similarly, "[w]hether a trial court followed an appellate court's ruling on remand is a question of law that this Court reviews de novo." *Schumacher v Dep't of Natural Resources*, 275 Mich App 121, 127; 737 NW2d 782 (2007).

## III. WHETHER THE TRIAL COURT COMPLIED WITH THIS COURT'S REMAND ORDER

### A. THE CATALYST THEORY

Blue Cross argues that *Tinman III* soundly rejected any attempt to use the catalyst theory as a reason to justify attorney fees, having concluded that Blue Cross's change to its emergency claims policies was voluntary. However, Blue Cross argues, the trial court improperly revisited the issue. We conclude that, while the trial court did spend a great deal of time taking this Court to task for its alleged misinterpretation and application of *Buckhannon*, the trial court's discussion on the issue was largely irrelevant and did not form the basis for the trial court's ultimate fee award.

"On remand, a trial court is required to comply with a directive from an appellate court." *Duncan v Michigan*, 300 Mich App 176, 188; 832 NW2d 761 (2013). "The law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue." *KBD & Assoc, Inc v Great Lakes Foam Tech, Inc*, 295 Mich App 666, 679; 816 NW2d 464 (2012). Thus, "[t]he power of the lower court on remand is to take such action as law and justice may require so long as it is not inconsistent with the judgment of the appellate court." *Id.* at 544 (internal quotation marks omitted). Under this doctrine, the decision of an appellate court is controlling at all subsequent stages of litigation, so long as it is unaffected by a higher court's opinion. *Duncan v State*, 300 Mich App 176, 188-189; 832 NW2d 761 (2013). "It is the duty of the lower court or tribunal, on remand, to comply strictly with the mandate of the appellate court." *Rodriguez v Gen Motors Corp*, 204 Mich App 509, 514; 516 NW2d 105 (1994).

While the law of the case doctrine precluded the trial court from revisiting the catalyst theory on remand, there is no indication that the trial court used the catalyst theory previously rejected in *Tinman III* as a basis for enhancing fees on remand. When discussing *Wood* factor 3 (results achieved), the trial court noted:

> This Court recognizes that the end result was a mere Eight Hundred Eleven and 00/ 100 ($811.00) Dollars recovery for Tinman. Yet Tinman and his lawyers were successfully granted summary judgment. The Appellate Court must keep in mind that by BC/BS attorney's own admission, BC/BS only paid Tinman after it heard it would not have to pay any other wrongfully rejected emergency room bills.

The trial court was silent on whether plaintiff's action resulted in a "common good." The high fee award was not the result of the trial court finding that plaintiff's lawsuit was a catalyst to changing defendant's behavior; instead, the trial court allowed such fees because it ultimately

blamed defendant's tactics during the litigation, which necessitated extensive discovery and excessive man hours. The trial court's discussion on the proper interpretation of *Buckhannon* notwithstanding, it does not appear that the trial court violated the law of the case in a technical sense.

## B. PLAINTIFF'S NEED TO DEMONSTRATE THAT BLUE CROSS DENIED THE CLAIM BASED ON "FINAL DIAGNOSIS"

Blue Cross next argues that the trial court was operating under the misconception that this case required plaintiff to prove that defendant denied Tinman's emergency room claim on the basis of his "final diagnosis." It argues that the issue was much simpler – whether plaintiff manifested signs and symptoms at the time he presented to the emergency room. We disagree.

Blue Cross points to this Court's decision in *Tinman I,* as support for its assertion that only plaintiff's signs and symptoms were at issue. In *Tinman I,* the Court's sole purpose was to determine whether the trial court erred in denying defendant's motion to decertify the class action. The opinion focused on whether the individual questions of fact predominated over the issue common to the class members. The Court specifically held:

> Here, the trial court broadly framed a common question that merely encompasses the legal claim in this case. As correctly asserted by defendant, a highly individualized inquiry must take place to determine whether defendant engaged in a reasonable investigation based on the available information before denying a particular claim. In other words, whether a potential class member is "entitled" to coverage for emergency health services depends at least in part on whether the individual's condition rose to the level described in MCL 550.1418. In the context of plaintiff's contention that defendant's alleged violation of MCL 550.1418 also comprises a violation of MCL 550.1402, it must be determined with respect to each claimant whether the claimant was provided emergency health services "for medically necessary services" resulting from "the sudden onset of a medical condition that manifest[ed] itself by signs and symptoms of sufficient severity," as well as whether any denial of payment was for emergency health services up to or after the point of stabilization. The same inquiries apply in regard to plaintiff's assertion that defendant's alleged violation of MCL 550.1418 also constitutes a breach of contract.
>
> Rather than being subject to generalized proofs, the evidence of the type of emergency health services and medically necessary services provided, the medical conditions involved and whether they occurred suddenly, the signs and symptoms that manifested those medical conditions, and whether payment was denied for services up to the point of stabilization will all vary from claimant to claimant. Thus, it is evident that to determine defendant's liability, highly individualized inquiries regarding the circumstances relevant to each claim clearly predominate over the more broadly stated common question in this case. [*Tinman I*, 264 Mich App at 5645-65.]

*Tinman I* concluded that individual claims dominated, but it set forth no particular path in how any one individual would prove his claim. Thus, contrary to Blue Cross's assertions, the Court in *Tinman I* did *not* hold that plaintiff merely had to show that he presented signs and symptoms warranting emergency room symptoms; at the heart of the matter was Blue Cross's basis for denying payment for the emergency room services. Plaintiff had to demonstrate that Blue Cross did not commit a "bona fide error" under MCL 550.1402(11). Although *Tinman I* indicated that individualized inquiries dominated, it does not follow that plaintiff was relieved of showing liability. As part of that undertaking, plaintiff set out to prove that Blue Cross systematically denied coverage to its participants based on the final diagnostic code, which was a direct violation of MCL 550.1418.

Zuccarini testified that a principle allegation in the Tinman case was that defendant had violated MCL 550.1418(1) by denying payment based on final diagnosis. The following exchange took place on direct examination:

> *Q*. From an economic perspective would it make any sense as a lawyer to commit the time and resources to a case for Tinman alone for $800 without the statutory promise of a ["]shall be["] attorney fee?
>
> *A*. For Tinman alone unless there was a fee shifting provision like this it's unlikely a case that we would pursue.
>
> *Q*. In terms of preparation before filing suit would it make sense to commit those resources without having some idea of what the potential remedies and recoveries might be?
>
> *A*. It would not make sense to do that.
>
> (Brief pause)
>
> I'm not sure I answered your question correctly, but it would not make sense to do that without having first determined what your rights and remedies would be, that's what I meant to say.
>
> *Q*. And did you understand as your ethical obligations if you decided you couldn't make enough money on the case could you just abandon it and say, class was decertified, sorry, Mr. Tinman, we're abandoning you?
>
> *A*. Ethically we could, I would, could not and would not do that.

In light of Blue Cross's repeated denials that it failed to pay claims on the basis of a patient's final diagnosis, Zuccarini believed that he had to show that the allegations in the complaint were true – that Blue Cross was "in fact systematically denying claims on the basis of final diagnosis."

Zuccarini testified to certain "smoking gun" documents that were discovered while the case was in federal court. Defense counsel objected, arguing that "none of these documents are relevant under the Court of Appeals opinion that decertified the class in 2004." The trial court noted: "Well I'm overruling it because it go[es] to the amount of work that may go, I don't

know, I have to look at it, but that may go to the amount of work that was put into the case whether it affects Tinman individually or not, I don't know." The following exchange took place:

MR. WALSH [defense counsel]: It's irrelevant under the legal standard articulated by the Court of Appeals, but we can't seem to disabuse Plaintiffs of that. So they continue to assert that final diagnosis is critical and it's not.

THE COURT: We're not here about final diagnosis, we're here about attorney fees.

I'm not here to decide whether or not Blue Cross did or did not pay a bill based upon a final diagnosis, that's not my role here.

MR. WALSH: Well that's what they're making it, they're making their whole case hinge on that.

THE COURT: No, I'm understanding them – well what I'm getting, and correct me if I'm wrong, I had assumed that you were presenting this as the documents you used to get Tinman's summary disposition granted by the state court [in 2005].

MR. BENDURE [plaintiff's counsel]: Exactly.

THE COURT: That's what I understood this to be. And it doesn't matter if it was produced in, well you can argue that later, but I'm not understanding your objection.

I'm not deciding whether they did final diagnosis or not. Apparently Judge Moore decided that they did and granted summary disposition, and this would've been used to get Judge Moore to make that decision; am I correct?

MR. BENDURE: Yes.

MR. WALSH: Your Honor, our position is this line of argument is we had to spend hundreds and hundreds of hours in federal court to get these documents. If they're saying we're not asking for recovery of the time spent in federal court discovery I'll sit down, but they're not going to tell you that.

And it was relevant only to –

THE COURT: to what?

MR. WALSH: -- the class prior to its decertification and I think that –

MR. BENDURE: Obviously it was the basis for summary disposition of the Tinman individual case, that's not the case.

THE COURT: That doesn't make this document any less admissible. Whether or not at this point in time I can't tell whether it's relevant, it may affect its weight in making a decision, but it doesn't make it any less admissible because it is part of the record of the Wayne County Circuit Court.

Zuccarini testified that Blue Cross's repeated denials created additional work because the responses were inconsistent with Blue Cross's own internal memos. And, while one memo indicated that coverage was triggered based on presenting symptoms, the professional claims form did not include a field for presenting symptoms.

Zuccarini did not believe the merits of the issue of liability were different for plaintiff than the other class members and the firm was not seeking fees for time dedicated to the class action. Only the Tinmans were interviewed; no other class plaintiffs were contacted.

Similarly, attorney Simon testified that the firm learned about a systemic denial by defendant after reviewing 50,000 pages of documents. The following exchange took place:

MR. WALSH: Objection, your Honor, that's completely irrelevant. The Court of Appeals has ruled that this case is about Mr. Tinman's claim and nothing else.

THE COURT: Overruled, for the reason that he's explaining what work he had to do for Mr. Tinman. He['s] explaining work he had to do for Mr. Tinman, also that he was doing for a class, that's what I'm getting.

MR. BENDURE: That's exactly where we're going, your Honor.

THE COURT: That's what I'm getting out of it.

MR. WALSH: For the record, your Honor, I'd like to state that the initial Court of Appeal[']s opinion decertifying the class ruled that it was Mr. Tinman's signs and symptoms that were determinative of his recovery and nothing else. Thank you.

Simon testified that the discovery process confirmed the existence of Blue Cross's declining coverage on the basis of final diagnosis. It "allowed us to prevail in the Tinman case both in terms of disproving the defenses that had been asserted by counsel and by establishing a very, very extensive record to confirm that Blue Cross itself admitted and confirmed they were violating the statute, and had violated the statute by their practice."

Young remembered "30, 40, 50 boxes of physical documents in the hallway" containing 50,000 pages of documents that the attorneys had to review. It was among those documents that they unearthed evidence that defendant based its payment decision on final diagnosis instead of signs and symptoms. In Young's opinion, "Tzvih's case was to prove that Blue Cross denied his claim on the basis of final diagnosis." "What we were going to prove for Tzvih Tinman as the named class rep, had the case continued to be certified, would have proven the case for everybody else. The fact that it was decertified is no detraction from the fact we still had to prove these basic elements for Tzvih Tinman's case."

-17-

Wassman believed that Blue Cross systematically refused payment to its insureds and a bona fide error did not exist. He noted that Blue Cross never admitted to refusing to pay emergency room claims on the basis of final diagnosis "and from what I'm hearing today they still deny it." Wassman explained how the merits of Tinman's individual claim jived with the class action:

> Mr. Tinman's individual claim was that his claim was rejected based on final diagnosis. Because defendant denied that they were using final diagnosis in the answer and they denied it in their responses to discovery requests the only way to prove that this claim was denied based on final diagnosis was to look at the reject code on his explanation of benefits.
>
> To dig into Blue Cross' computer systems, internal policies, internal practices to figure out what that reject code actually meant to figure out how their computer analyzed whatever claim data they had. And once we established what they did internally then we could prove that his reject code was based on final diagnosis.
>
> To the extent we could prove that then class members could use that proof for their own claims and say if they had the same reject code then they were denied based on final diagnosis as well. So that's the nature of an actual or potential class action, which is if you prove the individual's claim on the merits you've proven at least a significant portion of the class members' claims.

In order to prove Tinman's claim, they had to "prove what was happening behind the curtain." Wassman believed efforts taken on behalf of the class were compensable as a result of the common benefit it created for all of Blue Cross's customers, regardless of whether the class was decertified.

> Wassman felt ethically obligated to represent Tinman even if there was no class certification:

> Not only from a legal ethics [standpoint] but just from a basic decency standpoint. Once you accept representation of the client I believe it's your obligation to continue to represent that client to the end unless the client does something to warrant severing the relationship. You've taken the client on. It's your obligation to see it through to the end. And it's your obligation to represent them to the best of your ability.

The decertification did not change the nature of the liability issue – "We still had to prove that his individual claim was denied based on final diagnosis." Wassman did not consider the fact that this was simply an $800 case – "I don't leave my client out to dry because their claim isn't big enough."

> That plaintiff's undertaking would have potentially benefited the class does not undercut the fact that the undertaking also benefited him by revealing the "smoking gun" documents forming the basis for his successful motion for summary disposition. As such, the trial court on

remand did not abuse its discretion in allowing plaintiff to recover fees for time spent proving that defendant denied his individual claim on the basis of final diagnosis.

C.  CUSTOMARY RATE AND REASONABLENESS OF HOURS CLAIMED

Finally, Blue Cross argues that the trial court failed to make adequate findings regarding the customary local hourly rate of each attorney, the reasonableness of the hours claimed, and the need for more than one attorney on the same task.  Unfortunately, we have to agree that the trial court failed to comply with the mandates of our *Tinman III* opinion.

In *Tinman III*, this Court clearly set forth the law regarding how attorney fees must be calculated:

> As discussed, the party requesting attorney fees bears the burden of proving that the fees are reasonable. *Smith,* 481 Mich. at 528–529. "In Michigan, the trial courts have been required to consider the totality of special circumstances applicable to the case at hand." *Id.* at 529. In *Wood v Detroit Auto Inter–Ins Exch,* 413 Mich. 573, 588; 321 NW2d 653 (1982), mod by *Smith,* 481 Mich. at 522, the Michigan Supreme Court listed six factors relevant to computing reasonable attorney fees:
>
> > (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. [Internal citation and quotation marks omitted.]
>
> The *Smith* Court noted that the eight factors listed in MRPC 1.5(a), which overlap the *Wood* factors, have also been used to determine reasonable attorney fees:
>
> > "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> >
> > (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> >
> > (3) the fee customarily charged in the locality for similar legal services;
> >
> > (4) the amount involved and the results obtained;
> >
> > (5) the time limitations imposed by the client or by the circumstances;
> >
> > (6) the nature and length of the professional relationship with the client;
> >
> > (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent." [*Smith,* 481 Mich. at 530, quoting MRPC 1.5(a).]

"In determining 'the fee customarily charged in the locality for similar legal services,' the trial courts have routinely relied on data contained in surveys such as the Economics of the Law Practice Surveys that are published by the State Bar of Michigan." *Smith,* 481 Mich. at 530.

The *Smith* Court held that some fine-tuning of the multifactor approach was needed:

> We hold that a trial court should begin its analysis by determining the fee customarily charged in the locality for similar legal services, i.e., factor 3 under MRPC 1.5(a). In determining this number, the court should use reliable surveys or other credible evidence of the legal market. This number should be multiplied by the reasonable number of hours expended in the case (factor 1 under MRPC 1.5[a] and factor 2 under *Wood*). The number produced by this calculation should serve as the starting point for calculating a reasonable attorney fee. We believe that having the trial court consider these two factors first will lead to greater consistency in awards. Thereafter, the court should consider the remaining *Wood* /MRPC factors to determine whether an up or down adjustment is appropriate. And, in order to aid appellate review, a trial court should briefly discuss its view of the remaining factors. [*Smith,* 481 Mich. at 530–531.]

The *Smith* Court emphasized that the fee applicant bears the burden to produce satisfactory evidence that the requested rates are reasonable, and it explained the types of proofs needed to establish that the rates comport with those prevailing in the locality for similar legal services. *Id.* at 531–532.

> The fees customarily charged in the locality for similar legal services can be established by testimony or empirical data found in surveys and other reliable reports. But we caution that the fee applicant must present something more than anecdotal statements to establish the customary fee for the locality. Both the parties and the trial courts of this state should avail themselves of the most relevant available data. For example, as noted earlier, in this case defendant submitted an article from the Michigan Bar Journal regarding the economic status of attorneys in Michigan. By recognizing the importance of such data, we note that the State Bar of Michigan, as well as other private entities, can provide a valuable service by regularly publishing studies on the prevailing market rates for legal services in this state. We also note that the benefit of such studies would be magnified by more specific data relevant to variations in locality, experience, and practice area. [*Id.* at 531–532.]

"[R]easonable fees are different from the fees paid to the top lawyers by the most well-to-do clients." *Id.* at 533.

Next, the *Smith* Court explained that the "court must determine the reasonable number of hours expended by each attorney." *Smith,* 481 Mich. at 532. The fee applicant is required to "submit detailed billing records, which the court must examine and opposing parties may contest for reasonableness. The fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Id.* The reasonable hourly rate must be multiplied by the reasonable hours billed to produce a baseline figure. *Id.* at 533. The court should then "consider the other factors and determine whether they support an increase or decrease in the base number." *Id.* If multiple attorneys expended hours on a case, the trial court "should be careful to perform a separate analysis with reference to [each attorney] ..., considering both the hourly rates and the number of hours reasonably expended...." *Id.* at 534. A court should also consider whether it was reasonable to have multiple lawyers "on the clock" during the case. *Id.*

In *Augustine,* 292 Mich App at 413, 439, this Court vacated an award of attorney fees and remanded for rehearing and redetermination because, among other reasons, the trial court did not properly apply *Smith.* The trial court "did not comply with the first step in the *Smith* analysis, which is to determine the fee customarily charged in the locality for similar legal services. Though the trial court discussed the evidence presented regarding the fee customarily charged in the locality for similar legal services, it did not conclude that $500 an hour was the fee customarily charged." *Id.* at 426. "[T]he trial court apparently failed to credit the Michigan Bar Journal in its calculus of the appropriate hourly rate. The Michigan Bar Journal article not only ranks fees by percentile, it differentiates fee rates based on locality, years of practice, and fields of practice." *Id.* at 427. Although the trial court in *Augustine* found that $500 was a reasonable fee, it "did not find that $500 per hour was the *fee customarily charged in the locality for similar legal services ."* *Id.* at 427–428 (emphasis in original). Further, after multiplying the $500–an–hour rate by the number of hours reasonably expended, the trial court failed to determine "whether an upward or downward adjustment was appropriate on the basis of the *Wood* and MRPC 1.5(a) factors as our Supreme Court discussed in *Smith...."* *Augustine,* 292 Mich App at 428.

In addition, the *Augustine* Court concluded that "[n]ot only did the trial court fail to make specific findings consistent with *Smith* generally, but it also failed to make findings regarding each attorney whose fees plaintiff sought to recover." *Id.* at 428. This Court "direct[ed] the trial court to make specific findings, consistent with *Smith,* for each attorney whose fees plaintiff sought to recover." *Id.* at 439. This Court also found deficiencies in the trial court's finding regarding the number of hours expended, because of the meager state of the record. *Id.* at 434. [*Tinman III,* at slip op, pp 6-9.]

The *Tinman III* Court found the trial court's initial findings insufficient to allow for appellate review regarding fees customarily charged:

Here, the trial court failed to make adequate findings to aid appellate review, as required by *Smith* and *Augustine.* The trial court listed the *Wood*

-21-

factors and then correctly cited *Smith* for the proposition that "[t]he first determination to be made is what the customarily charge [sic] fee is in the locality for similar legal services." However, as in *Augustine,* the trial court failed to state any findings regarding the customarily charged fee in the locality for similar legal services. Instead, the court merely stated, in conclusory fashion: "After considering all of the evidence in this case, a reasonable fee for attorneys Simon, Zuccarini, Wassmann and Young is $400 per hour. The remaining attorneys shall be entitled to the fees requested." The trial court did not state any findings regarding the fees customarily charged in the community for similar legal services or indicate that the fees awarded represented the customary fees. The trial court also failed to cite any evidence to establish the customary fee for the locality, such as "testimony or empirical data found in surveys and other reliable reports." *Smith,* 481 Mich. at 531–532. Mere anecdotal statements are insufficient. *Id.* at 532. In addition, the trial court did not explain why it was awarding the same hourly rate of $400 for Simon and three of the attorneys in his firm, given their differing levels of experience. We direct the trial court on remand to make specific findings consistent with *Smith* and *Augustine* regarding the customary fee in the locality for each attorney whose fees plaintiffs seek to recover. [*Tinman III,* slip op, pp 9-10.]

However, the trial court did not correct this problem. On remand, the trial court noted:

> The Appellate Court references the State Bar Study on the Economics of the Law. Even though somewhat outdated, the Simon firm is in the top 5% of practitioners per its hourly rate as of 2005. The fact that they have remained unpaid is a consideration. There is no provision in the law for penalty interest on the fees, such as in no-fault cases. Thus an award of Four Hundred and 00/100 ($400.00) per hour is not unreasonable given the fact that the law firm has remained unpaid for 9 years.

The trial court failed to follow *Tinman III*'s directive that it "make specific findings consistent with *Smith* and *Augustine* regarding the customary fee in the locality for each attorney whose fees plaintiffs seek to recover." *Tinman III*, slip op, p 10. In no way did it set forth the *customary* fee. Once again it stated in a conclusory fashion that $400 was a reasonable hourly rate. In fact, the trial court on remand undertook its own independent analysis of *Smith*, finding persuasive the concurring and dissenting opinions in that case. To the extent the trial court refused to establish the customary fee in the locality, it violated this Court's directive as well as the law of the case doctrine.

*Tinman III* also addressed the number of reasonable hours expended on the case. We noted:

> The trial court's analysis regarding the number of hours expended was also insufficient to aid appellate review. The trial court stated:
>
> > BCBSM argues that Plaintiff's request includes time spent pursuing the class action. Plaintiff has already reduced the request for attorney fees by

the number of hours attributable to the [unsuccessful] class action lawsuit. It is difficult for the attorneys and the court to allocate the remainder of the fees to either the individual claim or the class action claim. For example, because BCBSM utilized an automated procedure for handling all emergency claims, the discovery sought by Plaintiff related to both BCBSM's handling of Plaintiff's individual emergency claims and BCBSM's handling of all other claims. The fact that the evidence necessary to prove Plaintiff's individual claims was the same evidence necessary to prove other claims does not change the fact that the discovery Plaintiff conducted supported Plaintiff's individual claim. For that reason, where the attorney fees can reasonably be associated with the individual claim, they will be awarded.

The trial court further indicated that it had reduced plaintiffs' requested fee by 309 hours for excessive time on various tasks, including attendance at and preparation for motions, drafting pleadings and orders, preparation of a trial outline, book, and exhibits when no trial was scheduled, and attorney conferences. The court also stated that Lebenbom's fee request was "significantly reduced" because of a lack of detail in his request, but the court offered no further explanation regarding the reduction. The court then stated that plaintiffs were awarded $655,000 in attorney fees but did not explain precisely how it reached that figure.

We conclude that the trial court did not explain adequately how the hours for which it was awarding a fee were reasonably expended in pursuit of plaintiffs' individual claim. Again, "[th]e fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Smith,* 481 Mich. at 532. Defendant was entitled to contest the reasonableness of the hours submitted. *Id.* As discussed above, defendant was deprived of a fair opportunity to contest the hours expended because the trial court erroneously refused to complete the evidentiary hearing. Further, the trial court did not explain why the substantial time devoted to discovery efforts in federal court were reasonably necessary to establish plaintiffs' individual claim as opposed to the unsuccessful class-action claim. Given that plaintiffs bore the burden of providing evidentiary support for their claimed hours, it was not sufficient for the trial court to state that plaintiffs had already reduced the request by the number of hours attributable to the class-action effort or to state that it was "difficult for the attorneys and the court to allocate the remainder of the fees to either the individual claim or the class action claim." Although the trial court later indicated that it had awarded fees where they were "reasonably associated with the individual claim," and that the evidence necessary to prove the individual claims was necessary to prove other claims, the court's explanation for this conclusion did not suffice to aid meaningful appellate review.

Finally, the trial court failed to explain adequately why it was reasonable for plaintiffs to have multiple lawyers "on the clock" in this case. The court stated that the use of more than one lawyer on the same general task is not necessarily excessive, that effective preparation often involves collaboration, and that "[i]n

several instances, the court deems reasonable the use of more than one attorney in this case." The court stated that it reduced the number of hours to a more reasonable figure when deemed excessive. The court offered no specific findings explaining on what grounds it had concluded that multiple attorneys were required to perform specific tasks. The trial court should address this issue more fully on remand. [*Tinman III*, slip op, pp 10-11.]

Once again, the trial court failed to correct this issue on remand. While we agree with the trial court that the mere fact that many of the efforts that plaintiff undertook to prove his individual assertion (that Blue Cross rejected claims based on final diagnosis) would have also benefited the class does not compel a finding that those efforts were somehow overdone. Plaintiff's attorneys should be compensated for that time, as previously discussed. However, the trial court failed to provide a more detailed explanation for its award. Once again the trial court simply indicated that it had substantially reduced plaintiff's previous fee request by eliminating class action efforts. So, while plaintiff was entitled to fees that were incurred in proving his case, the trial court failed to specifically set forth which of the fees requested were incurred as a result of the individual suit and why or how those fees were reasonable. Again, the trial court's statements are conclusory. For example, regarding duplicative efforts, the trial court noted that "anyone who ever worked in a law firm acknowledges that the firm attorneys discuss cases, as would be in any firm whose client is their paramount concern. A different analysis of this phenomenon would be to ignore the fact that most attorneys take their oath of office seriously." Much of the evidentiary hearing was focused on efforts that plaintiff's attorneys claimed were for the benefit of plaintiff's individual claim, but may have been more related to the federal class action, such as investigation of ERISA claims, time spent preventing defendant's motion to seal the record, etc. The trial court did not address any of these individual issues.

It is clear that this case must return to the trial court for another visit. However, we are of the opinion that there is no need to conduct additional hearings on remand. The trial court may take the vast testimony from prior evidentiary hearings to craft more detailed findings. We, therefore, leave it to the trial court's sole discretion whether to accept additional evidence and testimony on remand.

## IV. FEES FOR FEES

Blue Cross next argues that the trial court abused its discretion in awarding "fees for fees" because they were not recoverable under MCL 550.1402(11). The fees were incurred, not as a result of maintaining the lawsuit itself, but as a result of post-judgment proceedings and were not related to the merits of the case. We agree.

On remand, the trial court made the following decision:

At closing arguments, [defendant] suggested that attorney fees for pursuing the attorney fee request is not compensable. Cases involving 42 USC 1988 have allowed recovery for time spent litigating fees. See *Weigant v. Okst. 198 Fd 3rd 311 (2nd Cir. 1992)* [sic *Weyant v Okst*, 198 F3d 311 (CA 2 1999)] as well as our own federal bench in *Weisenburger v. Huecker, 593 F2d 49 (6th Cir. 1979)*. Michigan unpublished law regarding fee awards other than PA 350 have

upheld the award of fees for the request, *Summers v. Summers, Court of Appeals #309086 (10/11/12)* and *Johnson v. Johnson, Court of Appeals #266026 (3/271/7)*.

There is no published court of appeals opinion precisely on this point. This court finds that Tinman's argument is persuasive. In order to accept [defendant's] argument, [defendant] would be compensated for the 15 days of testimony on attorney fees, but not the Plaintiffs. This is particularly illogical in light of the fact that [defendant] presented no evidence or witness[es] to rebut anything Plaintiff's attorneys stated. [The United States] Supreme Court held that even recovery of a nominal amount of damages is a prevailing party. The court finds, as a matter of unrebutted fact, that Mr. Simon spent 137.5 hours, Mr. Zuccarini spent 328.5 hours and Mr. Bendure (counsel representing the Simon law firm) spent 94.70 hours on fee recovery.

Mr. Wassman, Young and Yert testified either voluntarily or through subpoena. No evidence was ever introduced regarding their participation in the fee recovery aspect of this case. For Mr. Simon and Mr. Zuccarini this Court awards a fee of One Hundred Eighty-six Thousand Three Hundred and 00/100 ($186,300.00) Dollars. Mr. Mark Bendure submitted time of 94.7 hours as attorney fees for the Simon firm, limited to remand representation.

After discussing Bendure's qualifications, the trial court determined that his $350 an hour rate was within the State Economics Survey and awarded him $33,145.00 for the remand evidentiary hearing.

We conclude that the "fees for fees" issue has been waived, at least as applied to fees incurred by plaintiff's attorneys prior to the *Tinman III* decision. The trial court did not award such fees in its 2010 order. Although defendant appealed from that order, plaintiff did not file a cross appeal. As a result, this Court's decision in *Tinman III* is silent on the issue of "fees for fees." Although an appellate court may not have specifically addressed an issue in a prior appeal, the law of the case doctrine acts to preclude relitigation of questions "necessarily suggested" by the court's ruling. *City of Marysville v Pate, Hirn & Bogue, Inc*, 196 Mich App 32, 35; 492 NW2d 481 (1992). Therefore, the doctrine applies to "those questions necessary to the court's prior determination." *City of Kalamazoo v Dep't of Corrections (After Remand)*, 229 Mich App 132, 135; 580 NW2d 475 (1998). This is in keeping with the "primary purpose" of the law of the case doctrine, which "is to maintain consistency and avoid reconsideration of matters once decided during the course of a single lawsuit." *Id.* Thus, for the doctrine to apply, it is enough that the prior ruling implicitly decide an issue. "The doctrine applies to questions specifically decided in an earlier decision and to questions necessarily determined to arrive at that decision." *Webb v Smith*, 224 Mich App 203, 209; 568 NW2d 378 (1997) lv den 459 Mich 862 (1998). *Tinman III* was silent on the issue because plaintiff never made it an issue by appealing from the trial court's previous order that failed to award such fees. Allowing plaintiff to pursue "fees for fees" would make for the type of piecemeal litigation that the law of the case doctrine seeks to avoid.

However, while plaintiff's attorney "fees for fees" were waived prior to this Court's decision in *Tinman III*, the same may not be true regarding the fees incurred on remand. "The power of the lower court on remand is to take such action as law and justice may require so long as it is not inconsistent with the judgment of the appellate court." *Sokel v Nickoli*, 356 Mich 460, 464; 97 NW2d 1 (1959). Therefore, the trial court was within its right to determine whether plaintiff was entitled to the collection costs for proceedings that took place after *Tinman III*. Nevertheless, the trial court did not set forth an adequate legal justification for its award.

The trial court cited two unpublished Michigan cases in support of its "fees for fees" award. Unpublished opinions are not precedentially binding. MCR 7.215(C). Moreover, the cases themselves are not helpful. In the divorce case *Summer v Summers,* unpublished opinion per curiam of the Court of Appeals, issued October 11, 2012 (Docket No. 309086), the wife's attorney sought attorney fees for the time spent having to seek attorney fees. The attorney noted that he had called opposing counsel and wrote several letters trying to resolve the matter but received a response on the eve of the evidentiary hearing. In the meantime, the attorney had already researched and contacted an expert to establish his hourly rate and also retained counsel to represent him at the hearing because he knew he would have to testify. *Id.* at p 5. After determining that the fees incurred by the wife were the result of the defendant's behavior, the trial court ordered the husband to pay her reasonable attorney fees. *Id.* at 6. This case is not helpful because it was decided under MCL 552.13, which permits a trial court to order a party to "pay any sums necessary to enable the adverse party to carry on or defend the action, *during its pendency*," and MCR 3.206(C), which permits the trial court to order a party to pay attorney fees in a domestic relations action, *including post-judgment proceedings*, if (1) the party requesting the fees is unable to bear the expense and the opposing party has the ability to pay, or (2) the fees were incurred because of the opposing party's refusal to comply with a previous court order. In contrast, MCL 550.1402(11) provides: "If successful on the merits, the member shall be awarded actual monetary damages or $200.00, whichever is greater, together with reasonable attorneys' fees." It is silent as to post-judgment proceedings. Therefore, it would appear that the statute focuses on awarding attorney fees to the extent those fees are incurred in pursuit of the merits of the case.

*Johnson v Johnson,* unpublished opinion per curiam of the Court of Appeals, issued March 27, 2007 (Docket No. 266026), is similarly unavailing. The primary issue in that case was whether the trial court had complied with this Court's remand order in determining that a wife's fees incurred on remand constituted appellate fees. This Court had specifically ordered the husband to pay the wife's appellate fees and the issue was whether the proceedings on remand were properly categorized as "appellate proceedings." This Court found that the trial court did not abuse its discretion in finding that the fees incurred on remand following the Court of Appeals order were appellate fees. *Id.* at 1-4. It concluded that the trial court's award for fees incurred on the original remand were fees "associated with this case" and, therefore, proper. *Id.* at 3-4. Once again, however, this was a divorce case, which is different from the case at bar. Whereas "[a] trial court may order one party to a divorce to pay the other party's reasonable attorney fees and litigation costs if the record supports a finding that financial assistance is necessary because the other party is unable to bear the expense of the action." O*lson v Olson*, 256 Mich App 619, 635; 671 NW2d 64 (2003), MCL 550.1402(11) provides: "If successful on the merits, the member shall be awarded actual monetary damages or $200.00, whichever is greater, together with reasonable attorneys' fees." It is silent as to post-judgment proceedings

and the parties' relative ability to pay. MCL 550.1402(11) permits fees to the extent those fees are incurred in pursuit of the merits of the case.

While plaintiff is entitled to attorney fees incurred in pursuit of the merits of his case, the merits do not encompass fees for fees. The trial court cited 42 USC § 1988, which provides:

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C.A. § 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . .[42 USC § 1988(b).]

In *Weyant*, the Second Circuit reiterated that a citizen must have the opportunity to recover the costs of vindicating a civil right in court and that "[a] culpable defendant should not be allowed to cause the erosion of fees awarded to the plaintiff for time spent in obtaining the favorable judgment by requiring additional time to be spent thereafter without compensation. Thus, a reasonable fee should be awarded for opposing the culpable defendant's unsuccessful postjudgment motions," including fees for time reasonably spent in preparing and defending an application for § 1988 fees." *Weyant*, 198 F 3d at 316.

Similarly, in *Weisenburger*, the Sixth Circuit determined that the time spent in pursing fees was compensable:

> When Congress passed the Act its basic purpose was to encourage the private prosecution of civil rights suits through the transfer of the costs of litigation to those who infringe upon basic civil rights. If a successful party in a civil rights suit is awarded attorney's fees under the Act and he cannot secure attorney's fees for legal services needed to defend the award on appeal, the underlying Congressional purpose for the Act would be frustrated. We conclude that implementation of Congressional policy requires the awarding of attorney's fees for time spent pursuing attorney's fees in the cases presently under review. [*Weisenberger*, 593 F2d at 53-54 (CA 6 1979).]

Unlike vindicating a citizen's civil rights, however, an action such as the case at bar is not one of such societal interest that plaintiff should be entitled to fees for fees. Therefore, the fee shifting found in § 1988 is not exactly on par with MCL 550.1402(11). And, especially given the fact that the issue was previously waived and the fact that the law upon which the trial court relied was not on point, the trial court abused its discretion in awarding plaintiff fees spent defending their fee application.

## IV. APPELLATE FEES

On cross-appeal, plaintiff argues that the trial court abused its discretion in failing to award appellate fees. We disagree.

At the hearing after *Tinman III*, defense counsel objected to when plaintiff's appellate attorney, Mark Bendure, attempted to testify because there was no basis in law for fees spent defending the appeal. The trial court agreed:

> Generally, the Court of Appeals assesses costs, not specific costs, but says that costs are awarded and then it remands it back to the Circuit Court for a hearing on the matter as to costs.

> In this instance, the Court of Appeals did not assess costs and fees, attorney fees, against anyone on either side. But I'm not going to create an appellate issue by not taking this testimony. We will take this testimony and then you can appropriately address the matter in a brief as to whether or not this section of the testimony is relevant to what we're here for today.

Ultimately, the trial court ruled:

> Lastly remains the Appellate costs of Tinman. The Court of Appeals remanded the case; it did not assess costs or attorney fees to either side. Therefore, until so ordered by the Michigan Court of Appeals, the trial court does not consider attorney fees or costs on appeal.

Though not directly on point, the Supreme Court's decision in *Haliw v City of Sterling Hts*, 471 Mich 700, 702; 691 NW2d 753 (2005) is instructive. In *Haliw*, the Court was asked to decide whether appellate attorney fees and costs were recoverable as case evaluation sanctions under MCR 2.403(O). In so doing, the Supreme Court rejected the Court of Appeals' theory that, because the court rule did not specifically exclude appellate attorney fees, it must have necessarily included them as a part of a case evaluation sanction. *Id.* at 706. The Court noted, under the "American rule," attorney fees and costs are generally not recoverable in the absence of an exception set forth in a statute or court rule expressly authorizing such an award. *Id.* at 707. And because MCR 2.403 expressly authorizes recovery of "a reasonable attorney fee" and "costs," but does not expressly authorize appellate attorney fees and costs, the American rule mandates that appellate fees and costs not be read into the court rule. *Id.* The Court further added that MCR 2.403(O) is "trial-oriented" and there is no mention of the appellate process in the rule. *Id.* at 707–708. In a footnote, the Court added that "[w]hile a causal nexus plainly exists between rejection and trial fees and costs, the same cannot be said with respect to rejection and the decision to bring an appeal. Rather, appellate attorney fees and costs are arguably 'necessitated by' a perceived erroneous trial court ruling." *Id.* at 711 n. 8.

Although *Haliw* addressed MCR 2.403, we note MCL 550.1402(11) has similar language: "If successful on the merits, the member shall be awarded actual monetary damages or $200.00, whichever is greater, together with reasonable attorneys' fees." The language in both MCR 2.403 and MCL 550.1402(11) is the same to the extent that they each allow for recovery of "reasonable attorney fees." Both are silent as to post-judgment proceedings. As noted in *Haliw*, an appeal is brought when a party perceives the trial court to have made an erroneous ruling. Because this Court in *Tinman III* did not provide for an award of appellate attorney fees and costs and because MCL 550.1402(100) focuses on awarding attorney fees to

the extent those fees are incurred in pursuit of the merits of the case, the trial court did not abuse its discretion in denying plaintiff's request for appellate attorney fees.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Mark J. Cavanagh
/s/ Henry William Saad